Randy Backrack for plaintiff's appellant Lola Dahlstrand a.k.a. her estate. This case presents several important questions at the threshold. First of all, does differential review mean no review? Number two, when a plan administrator decides to credit its own evidence over the claimant's evidence, does that evidence still have to be substantial? Number three, when the Supreme Court said in Black and Decker, we express no opinion on any other issues, did that mean no other opinion? And number four, in a case like this where you have complex and common disease such as MS, and the administrator decides to use a file review by its own doctors, and decides to credit its experts over treating physicians who have long-standing clinical experience with the patient, does that constitute a reasonable review? I submit it does not. Can I ask you this question just to get this focused? You did not claim below, nor do you claim on appeal that this policy is illusory? I did, to a certain extent, yes, with respect to the argument that Una made, that the definition for disability, that is the ensuring clause of the policy, states that if you're limited from performing your regular duties, that you're disabled. But then they say, oh, but see, you have to go to the boilerplate definitions in the back, and you have to find a definition for limited. That's a matter of contract interpretation, but you're not suggesting that there's no way an insured could meet the disability requirements of this policy, are you? In terms of own occupation? No, just are you contending that no reasonable insured could meet the disability requirements of this policy? The answer is no, isn't it? I would have to say no based on my experience. You're saying your client did, and there's ample evidence, et cetera, et cetera, but you're not saying it couldn't be met, right? No, that would be an absolute, and I can't say that. Okay. Now, if we could magically wipe away the evidence that Una, however you pronounce it, relied upon and focus just upon the information provided by your client's treating physicians, could she meet the elimination period requirement of the policy based just on what her doctor said? Absolutely. Tell us how. Well... First of all, tell for the benefit, perhaps, of the audience, what the elimination period was. Well, the elimination period is 90 days from the date of disability. Okay, we know how long it is. Tell us what it is. Well, it's a contractual period. It's a period of time during which, what? There's no benefits paid. During that 90-day period of time, the insured has to be what? Disabled. Disabled. Has to have... Now, would that understanding point to the information on your side of the case? Just hypothetical purpose, putting aside what the client administrator considered. Well... What is it that in your medical evidence shows that she was disabled within the meaning of the policy during the entire elimination period? At the very end of that period, she was seen by Dr. Bentz. Dr. Bentz filled out the portion of the attending physician statement for the claim. And in that statement, Dr. Bentz specified all the activities that she could not perform, which were all activities related to her job, decision-making, organizing high cognitive function activities. At that very same time, security title had already advised Unum that those were the job duties that she had. So you have at the very end of the 90-day period, you have the treating physician saying she can't do these things, which the security title has identified. I probably haven't done a very good job in answering that question. This is one of the reasons we ask for questions is to tell you a hurdle that we see perhaps for your client and to give you an opportunity to tell us how you get over it. I've looked at this record, and I cannot find in any of your client's treating physician statements an opinion or statement that says she was permanently disabled during that 90-day period of time. Now, if I've misread it or I've misapprehended it, this is your opportunity to get me straight. Your Honor, there isn't a functional capacity evaluation or a disability report during that period of time, and there's a reason for that, because she had a progressive disease. She had had multiple sclerosis for many years prior to her last day of work. Unum has consistently taken the position that this needs to be a precipitous event, the disability. That just isn't the case in a type of condition like MS. It's not a precipitous event. Could we go back and look at it a little differently, and just really following up on Judge Hawkins, because there's no doubt that Ms. Dahlstrom is a very sick person, has a number of illnesses, may or may not have MS because her own doctor retracts that statement later, but she certainly has some kind of degeneration or whatever akin to MS. But as I go through the doctor's disability, like one of them says, she is disabled at this point, but none of the disability statements, of which I believe there are four, talk about a disability during the period at issue. And isn't that really what they were asking her to provide and she never did provide? Well, in fact, Dr. Rosenbaum, who she saw in December, in his comment and statement to her, that he suggested that she see if she could get accommodations to her job. That, I believe, is in fact the same thing as saying, I recognize you cannot work at your job, so why don't you see if you can get accommodations? But that's not, I mean, again, when you're under this disability policy, it's not just a question of accommodations, because you might not be disabled even if you have accommodations. You just might need accommodations because of your illness. It doesn't necessarily mean you have a disability as defined by the plan, does it? No. So that's, I think, the question we're asking. We're left to read through all the doctor's reports, which I've done, and that brings you to this conclusion, which is you have a woman with a number of ongoing and continuing problems. But how do we tie that up with the planned disability period, which we're required to do and which UNUM was required to do? I think, you know, in a case like this, which is similar to the Wu case that's been cited, not in our circuit, but almost a, well, very similar fact, where you had an ongoing progressive condition that resulted in a period or point in time in which the beneficiary could no longer work. There wasn't a doctor at that point who said, stop working today. But she just physically and mentally could not continue working. But isn't it critical to have a doctor say she can't work, don't work? Well, that's usually the linchpin of any, whether it's social security disability, whether it's even a workers' comp issue, whether it's assessing it for tort liability, and certainly under an insurance plan of disability. The doctors usually approach it with a little more rigor and say, you can't work. Right. Well, even if you discount Dr. Rosenbaum in December, who basically said you can't work without accommodations, okay. Seeking, you should seek accommodations is different from a doctor, in my judgment, from a doctor saying you are released to work if you have accommodations. Yes, but see, this policy didn't require accommodations. So therefore, if in fact it was true that she could only work with accommodations, she was disabled because there was no accommodation provision in a requirement in this policy. But my point is that within a few months after she had her last day of work, we had three or four physicians on several occasions certify that she could not work. Yes, they were never asked by UNM the magic question, well, does that mean she couldn't work from December 21, 2000? They never asked that. It was a little bit of a sandbag in here. And if that was so important, that question should have been put in their denial letters to the doctor. There should have been some communication to either the claimant or to the doctors. By the way, we need to know if she couldn't work on that day. They never asked that question. Nobody ever called the doctors. Nobody ever, you know, basically until Mr. Dahlstrom complained vociferously in July about not being given information about what they need to perfect their claim, they had nothing from UNM, nothing at all other than you haven't given us enough evidence. That's your point on that. But then when he wrote in July, they wrote back and said, here's what we need. Actually, what they did is they finally sent an FCE form, a functional capacity evaluation form, and said, have your doctor fill this out, which she did. Dr. Benz filled it out, said she can work one to two hours a day, and most of the form was mental psych. And this was a clear error on the part of the district court and UNM because they rely heavily on the boxes that were checked on that form with respect to moderate disability. But if you look at the top of the form, it's only relating to psychological issues, not physical. And the whole form in its entirety shows clearly that the doctor said she was weak, she was unable to do her job. I mean, it was all physical, but when she checked those boxes, she was speaking only to the mental psychological issues. But yet UNM and the district court interpreted that to mean her total disability, which was a clear error. Let me ask you a question on another topic. You have asserted throughout, and UNM contests, it seems, that your client has MS. You've asserted this is a person who has a definitive diagnosis of MS, and UNM seems to contest that. And we know it's a complicated diagnosis. And there are indications in the record from time to time that people suspected it. But correct me if I'm wrong, and I may have missed something in the record. Usually when there's a firm diagnosis of MS, the doctors have followed a fairly rigorous protocol. I think it used to be the Schumacher test, and now it's the Poser test, where they test for lesions, test for a... criteria for the diagnosis. Although I see mention of a possibility of MS, I don't see any evidence in the medical records, and I may well have missed it, and you can help me out with that, that the doctors actually went through that rigorous criteria, discounted a lot of other possible diagnoses that could... Is that your understanding of the record, too? No, I don't view the record that way. The FCE that Dr. Benz filled out, one of the diagnoses she put down was demyelinating disease. That was part of her diagnosis. Dr. Schaffron, who's an expert in MS, had the total medical record, had the patient before her, said, I think, you know, she said, you have MS, but I want to be sure. Let's do an auditory visual evoked response, which they did. And that came out positive for MS. Then Unum says, or Unum's Dr. Graham, who's not an expert in MS, says, oh, well, they should have done a spinal tap. Well, that's the same thing as saying we don't have objective medical evidence of this disease. And this isn't even an expert in MS, questioning Dr. Schaffron. So I believe Dr. Schaffron did everything reasonable. Now, she did say in her first records she has MS. Then she used the word possible. Again, that's a medical term of art because it recognizes the fact that MS cannot be 100% diagnosed. No, I guess my question, I think our understanding of the record is correct, because I'm familiar with all of those pieces of evidence. But what I didn't see was what you will see in a MS diagnosis, where there actually is a series of we have to do this to eliminate this possibility. We have to perform this test to eliminate the possibilities of other lesions. And I think there's even a note that says need to confirm. But I think our understanding of the record is the same. We don't have a document that says we've done this, we've done this, we've done this, and this diagnosis is MS. You're right. We don't have a document that exactly tracks those items. Could I reserve?  Thank you for your argument, Kenneth. Good morning. My name is Kim Demarchian. On behalf of Lewis and Roca, I represent the Appellees in this case, the Long-Term Disability Plan of Security title, and Unum Life Insurance. And I suspect that I'm too short for this microphone to hear me. Is that a little bit better? That's fine. This case turns on the standard by which Unum's decision must be reviewed. Because the ERISA Planet issue reserves discretion to Unum to make benefits decisions, Unum's decision can be reversed by this Court only if it has no reasonable basis. And there is sufficient basis in the record. I would contend more than reasonable basis for Unum's denial of benefits. Do you think you'll lose if we review it at De Novo? I'm not sure whether you'd need to remand if you reviewed it at De Novo, because De Novo review might entitle Ms. Dahlstrom to additional evidence. But I don't think you need to review it at De Novo, because in order to overcome the plan's abusive discretion standard, Ms. Dahlstrom would have needed to introduce material probative evidence. But the conflict inherent in Unum being both administrator and the funding source had actually tainted the decision in this case. And Ms. Dahlstrom can't introduce that kind of evidence, because Unum evaluated every scrap of evidence that Ms. Dahlstrom provided, got all of her medical records, got job descriptions from her company, reviewed those medical records, sent them to multiple experts, even as the diagnosis and the basis of disability changed. And going through all those records, because there was no linkage between Ms. Dahlstrom's symptoms, with which she had worked for many years, and an inability to perform the material and substantial duties of her job, found that there was no satisfaction with policy's disability. The difficulty is it doesn't matter whether you're a bank teller or a manager or something else, you have a lady who cries all day long, according to her doctor. She's confused, she's on a whole series of psychiatric drugs. And really at the conclusion of her elimination period, she has a doctor who says she's unable to return to work for at least six months to a year, and says that she remains disabled. The question is, in the face of that kind of evidence, whether it's treating physician or not, because we don't credit it any extra, we now know, Black and Decker, what is the evidence from Unum that would fairly say, toss this disability determination out the window? Well, and it's important to remember that Unum is not the person, Unum is not the entity with the burden of providing evidence in this case. It's Ms. Dahlstrom. And what Unum has to do is conduct a reasonable evaluation of the evidence. And she provided evidence of disability. And she did provide evidence that she suffered from a number of serious medical conditions. She also provided evidence that she had suffered. And she had a doctor's opinion. She didn't just have evidence of problems. She had a doctor's opinion that she is disabled. Well, and let me jump to Dr. Walker's opinion, because I think that's the one that you're referencing. Dr. Walker is the one, let me make sure I've got the doctor's name right. Yes, Dr. Walker is the specialist who she saw for headaches. And Dr. Walker has, it looks like it's a form from his practice. It's his return to work or school form. He's crossed out school. He's circled work because it's for Ms. Dahlstrom. And he's indicated that she can't go to work for six months to a year. At the point that Dr. Walker completed that form, it had been a year since he had treated Ms. Dahlstrom for the conditions that he was then opining were disabling. Which is a problem with Dr. Walker's evaluation. There's also no evidence in Dr. Walker's evaluation that he knows what the specific functions of Ms. Dahlstrom's job are. And those are relevant because of the policy's definition of disability. I'm sorry, Judge Hawkins, I do want to answer your question. I want you to go ahead and make sure you've finished answering the question. I think that was the end of my thought about Dr. Walker. It's also important to consider the evaluation prepared by Dr. Bentz, which is the only other piece in the record that arguably ties Ms. Dahlstrom's medical history to why suddenly in December of 2000 she could no longer work with those conditions. That's the functional capacities evaluation. And that's the evaluation in which Ms. Bentz is asked, can Ms. Dahlstrom still perform her job? Let me find it for you in the record. Because I sense that you're looking for it. It is in tab 29 of the appellant's excerpt of record. Well, it's going to be a little bit hard to find. It has a Bates number 69 on the bottom of it. That's right. Okay. And this form asks Ms. Bentz the following question. What is Ms. Dahlstrom's ability to work relative to the attached job description? And she checks moderate. And if you read the key on the form, moderate is impairment effects but does not preclude ability to function. And precluded ability to function is the test for disability under the terms of this policy. I promise, Judge Hawkins, I'm done. I'd love to hear your questions. Well, don't say that until you hear it. True enough. We're looking at an entity that makes a decision about whether disability benefits are provided or not. Yes. And the case law provides us with touchstones as to whether that's done in a fair, neutral fashion. Yes. My question relates to a little different touchstone. Before UNAM made its final disability determination, is it correct that the Social Security Administration of the United States had determined that Ms. Dahlstrom was disabled?  We are told as an inferior court to the Supreme Court that we should pay significant deference to administrative agencies in carrying out their functions. We're a court that frequently reviews the work product of the appellate process that comes out of the Social Security Administration. They're not the most warm-hearted agency on the face of the earth. And in order to establish disability for SSI, as I understand it, you have to establish to their satisfaction that you cannot perform any task in the national economy. We frequently see cases from this administration where they've relied upon vocational experts that are dealing with people with lost arms and legs and other functions saying, well, this person could still be a parking lot attendant or something like that. What deference or attention did UNAM, number one, or the district court, in this case, number two, pay to the determination by the Social Security Administration that Ms. Dahlstrom was disabled? UNAM was aware that the Social Security Administration had awarded Ms. Dahlstrom benefits. The question that arose in the district court was whether UNAM's failure to defer to that decision was evidence that a conflict of interest tainted its decisional process. And the district court, mindful of the Supreme Court's admonition in the Nord case that Social Security standards shouldn't be imported into the ERISA context because they are so different from the plan provisions that will be specifically at issue in each ERISA case. Even if they're tougher? Even if they're tougher, and this is why. The definition of disability is clearly different. And for the first 24 months of benefits under Ms. Dahlstrom's plan, she only had to be disabled from her regular occupation as it was performed in the national economy, not from all occupations. After 24 months, she would, in fact, have to not be able to be a parking lot attendant, to use your example, to continue to obtain disability benefits. But here's what's different about Social Security. Social Security has a very complicated regulatory structure, and part of that regulatory structure is a set of presumptions. The treating physician rule is one of those presumptions, but there are also presumptions about certain medical conditions and what it means to have a medical condition. There are medical conditions that make one automatically disabled in the Social Security system. Actually, multiple sclerosis is one of them at certain stages of the disease. Let me ask you this, and I understand it's a hypothetical. The Social Security Administration had said, dead bang, that Ms. Dahlstrom was completely disabled in the eyes of Social Security law, and they identified the period, and just by sheer luck, the period happened to exactly match the elimination period as it applied to her under your client's policy. Would they have been required to defer in any way to that determination? They would be required to consider it. And your question actually raises the other important distinction to be drawn here, and that's that all that UNUM was given was a single-page letter from the Social Security Administration indicating that Ms. Dahlstrom's claim for benefits had been granted. UNUM was not given any of the evidence that the Social Security Administration relied on in making that determination. We asked Ms. Dahlstrom to provide us with any evidence that she wanted to provide us that she felt supported her claim. She certainly could have provided additional evidence to the Social Security Administration. I think that the answer is, did you ask her? No, we did not ask, but the burden is not on us. I think that's actually one of her complaints is, I mean, it's one thing to keep saying, if you have any evidence, send it in, and she keeps sending letters trying to detail things, but did you ever say to her, give us your Social Security file, and if you have evidence during the elimination period of disability in doctors' opinions during this period, please provide that. So it was like, please give evidence, and she did. She gave more evidence and more evidence, but it wasn't what you wanted, so it was like the ships are passing in the night here. All of the denial letters specifically explain the grounds for UNUM's decision. They go through the medical evidence that was available to them, and they say in every one, we can't understand why this functionally limits you from your job. If you have evidence that would change your mind, please give it to us. Right, but the other thing UNUM could have done is ask her for a waiver to see the file, because I think this is about as powerful as you find in a case like this when the Social Security Administration determines she can't work in the economy anywhere in the United States. And that, I think, is the biggest red flag on this case, is that it looks as though your client ignored that or said, well, all right, we need further proof. Now, I realize we are going to import Social Security standards, but the treating physician rule that was discussed in Black & Decker is far different from the ultimate determination of disability, which is a much stricter standard than a new policy. So that's the reason for concern here, because then the logical conclusion is maybe there is something to the conflict of interest if you're out of hand rejecting what should be an enormous red flag in this case. UNUM did tell her that they'd received the Social Security Administration's decision and that they didn't know the basis of the Social Security Administration's decision. She could easily have provided additional evidence. And, in fact, her failure to do so would suggest to a reasonable insurer that Social Security had exactly what the insurer had. And, again, the treating physician rule, while it was probably important in this case, in the Social Security Administration's determination, given what some of her treating physicians have said, if those opinions got deference rather than the appropriate level of scrutiny that UNUM applied, things might come out differently. But those presumptions in Social Security are so important in cases like this, presumptions about the nature of disabilities and how they interact with jobs, so that if you have certain conditions, the Social Security Administration doesn't really ask you to go through an analysis of jobs that are available in the economy. It says, if you have this disability, we're going to assume there's nothing for you to look at. And that's not the language of the plan. But we don't know what they did in this case. No, we do not. They might well have gone through the entire analysis and had a testimony from the vocational rehabilitation expert. Probably not. But it's a provision of the plan that Ms. Dahlstrand had the obligation to provide evidence in support of her claim. And under ERISA, plan provisions are strictly construed. And the courts don't get to come in and change the applicability of those plan provisions. May I ask a switch topic? Oh, of course. Are you contending she doesn't have MS? UNUM has consistently acknowledged that she has been diagnosed as possibly having MS. They've acknowledged the evidence of demyelinating disorder that stretches back in her file. This case isn't really about whether she has MS. It's whether whatever she has, does that mean she can't do her job? That's really the basis of UNUM's determination. Not any specific diagnosis. Why not send her to a specialist? Well, there's certainly no reason not to, but there's no obligation to send her to a specialist either. And particularly we're the sort of mystery of all of this is that we're being asked to look at the decision maker on disability benefits as if it were somehow different from, for lack of a better expression, a cold-hearted insurance company. We're supposed to look at this as if this is this neutral sort of magistrate looking after black and decker weighing evidence, getting expert testimony, having people look at it. Why not simply say that one of your physicians suggests you have MS. We've got a specialist. Go see Dr. Jones. Why not do that? Well, there are two answers. One is the dispute is really the answer to Judge Thomas' question. The dispute isn't about what condition she has. It's about how they relate to her limitations. And one of the reviewers of this file is an occupational specialist, someone whose specialty is looking at symptoms and how they relate to job capabilities. If this were an automobile insurance policy and the person making the claim was not the insured, I would expect my insured was claiming an injury that seems kind of suspect. I would expect my insurance company to ask that claimant, are you claiming that your back is broken? If you are, we want you to see this specialist so that we can determine that. If that's a reasonable expectation of the way an insurance company treats someone who's not their insured, why can't we expect that in an instance like this? First of all, because there's reason to believe that an expert in multiple sclerosis wasn't really necessary in this case where the issue was limitations. But secondly, because – Let me just stop you on that one. Sure. Do you dispute that the doctor that said she possibly had MS was qualified to say that? Not at all. We don't dispute Ms. Schaffrin's qualifications. Now, they're not in the record. We haven't gotten to sort of that point in the process. But that's not the issue. The problem with Ms. Schaffrin is she comes in very late in the process. Her notes indicate possible multiple sclerosis. There's no evidence that she knows what Ms. Dahlstrom's job is. And the only evidence of disability that she provides is literally a sheet torn from her prescription pad where she writes, is disabled at this point, which raises both the temporal problem, was she disabled for the necessary elimination period while her policy was in force, and the do you know what her job is and whether she can really do it based on what you're saying. Those are the issues with Dr. Schaffrin. Well, you've read all the records. Do you really believe she can work? When I look at the records, what I don't understand and what Eunim didn't understand is why she stopped working on December 21, 2000, when the day before she saw a neuropsychologist who said, go back to work, try to reduce your stress, come back and see me, we'll treat you. Not only did she not go back to work, she never even saw that doctor again. She stopped being treated for her depression beyond medicine that other doctors were administering. Well, didn't she testify or her records reflect that, in fact, by leaving work she had reduced her stress? She continued to have these other issues, but it had, in fact, reduced her stress? Isn't that what the record reflects? The record doesn't reflect testimony per se from her on that issue. She writes it in her little note. The record reflects a certain amount of up and down in her symptoms, both before she stopped working and after she stopped working. But it's key that she was seeing three specialists. She was seeing Dr. Toffel for seizures and headaches, Dr. Walker for headaches, and Dr. Rosenblum for her panic attacks and depression. None of those doctors ever said, stop working. Somebody needed to say, what's going on with this woman means she can't work. That's the piece that's missing here. That's the piece that's needed to meet the definition of disability under the policy. And the standard of review isn't, could Unum have acted differently? Could Ms. Dahlstrom have submitted different evidence? Could you look at the evidence in a different way? The standard of review is, is there a reasonable basis for Unum's decision? If there's a reasonable basis for Unum's decision, if it's not based on clearly erroneous findings of fact, then it has to be upheld under the abusive discretion standard. Thank you for your argument, counsel. Thank you. Do you have some time for rebuttal? Yes, thank you. We've never said that Social Security was something that they needed to adopt or accept wholesale. However, it is evidence and it should have been considered. There is nothing in the record that shows that it was considered in the slightest degree. This goes to the heart of what we see the problem and why we're here today. And that is the breathtaking view of the district court of the wake of Black and Decker. When you read the opinion, essentially all of the authorities that were cited by the plaintiff were discounted or dismissed because they predated Black and Decker. Whether it was Social Security or the need to have an expert when you have an uncommon complex disease, all of these critical issues that existed in ERISA before Black and Decker, all of a sudden don't exist anymore. They're gone. I suggest that when the Supreme Court said, we express no other opinion, they meant that. And they didn't throw out all the other body of law in ERISA. In this case, particularly the requirement that UNM should have gotten an expert on MS. Now, why didn't they? It's real simple. They wanted to take the position that there was no basis or reason for her to stop working, that it had to have a precipitous event. If they accepted MS as a diagnosis, that would explain why she stopped working because everybody knows it wouldn't have started during or right at the end of the elimination period. MS is a progressive disease over years. It culminated on that date for her. And the doctors afterwards explained, this is what she has. Yes, it's possible. There were more tests. Over time, it's been clear that she has this diagnosis. But UNM resists that diagnosis because that would then explain why she quit, why she had to quit. Does the doctor who saw her for MS make a link between her condition and the specific ability to perform tasks in her occupation? Other than the disability note that said she is disabled from all occupations, nothing specific as to her job. And I fault UNM for that, too, because UNM should have sent a job description and should have asked for that. They claim that they sent a job description to Dr. Benz when she filled out the FCE in March, but it wasn't attached. That puts in suspect the entire section of the FCE they rely heavily on, the psych section, because it specifically says, per attached job description, which we don't have. But all of the doctors, and I suggest that even Dr. Randall, who was one of their doctors, he said that she's restricted from excessive stress. Well, there you have it. I mean, all the doctors have recognized stress as the problem here, and no one disputes that that's the essence of her job as the manager of a busy title office, stress. And even Dr. Randall said she's limited from performing that job, a stressful job. I had gone through the order, and I had a list of about a dozen clear errors that I wanted to identify. I don't know how much time I have. We have about two minutes. Are these in your brief? Most of them, so probably. But at the end of the day, the question, one of the primary questions, perhaps a threshold question, is this enough to get you to conflict of interest? Because one could argue all of these things, saying, well, the evidence goes the other way, and your opponent could concede, well, a lot of things went wrong with the investigation, but that doesn't equate to a conflict of interest. Tell me why you think that. I believe there's a myriad of issues and facts on that. For UNUM to say that you have the responsibility to provide us evidence that you can't work for other employers, that's not in the plan. The plan has a definition of regular occupation, which includes how it's performed in the national economy. And here's a classic clear error by UNUM in the district court. The court said that UNUM was appropriate for UNUM to consider how her job was performed in the national economy. Yet there's no evidence that UNUM ever did that. It's obvious that UNUM made no attempt whatsoever to look at her job in the national economy. It merely said, you didn't give us evidence, you can't perform your job somewhere else. And even the district court didn't catch that, apparently, because the district court is under the assumption that UNUM did consider, did do something. But there's nothing in the record that says they did. It's clear from the totality of the record that UNUM was acting as an adversary in this case. They went out of their way to ignore and discount essentially all evidence and support. If you look at every single medical record that they commented on in their denial letters, they cherry-picked every single fact out of every record that supported the denial and ignored or misstated everything to the contrary. It wasn't just occasionally. It was every single record. That is an adversary. And we know from what the Ninth Circuit has said that that is a basis for finding, do you know whether you should apply and that's an abusive discretion. Almost perfect. Thank you for your argument. Thank both sides for their argument. The case just argued will be submitted for decision. Thank you.
judges: Hawkins, Thomas, McKeown